Adam DELGADO, Plaintiff,

v.

John ASHCROFT, Attorney General of the United States, Defendant.

Civ.A. No. 99–2311(JR).

United States District Court, District of Columbia.

Aug. 30, 2004.

4

Patrick D. Dolan, Stephen G. Seliger, Seliger, Elken & Dolan, Chicago, IL, Richard T. Tomar, Karp, Frosh, Lapidus, Wigodsky & Norwind, P.A., Rockville, MD, for Plaintiff.

David J. Ball, Jr., Weil, Gotshal & Manges, LLP, New York City, Meredith Manning, Hogan & Hartson, L.L.P., Eric Mark Jaffe, Jane M. Lyons, U.S. Attorney's Office, Washington, DC, for Defendant.

### MEMORANDUM RE: DISPARATE TREATMENT CLAIMS

ROBERTSON, District Judge.

The five plaintiffs in this case, all Hispanic or African–American, were unsuccessful applicants for Special Agent positions with the FBI. On May 29, 2003, after a bench trial, I found that the suitability determination process and "Adjudicative Guidelines" used by the FBI to select Special Agents have a disparate impact on Hispanics and African–Americans. Findings of Fact and Conclusions of Law ("May 29, 2003 Op."). The Federal Bureau of Investigation has renewed its motion for summary judgment on plaintiffs' disparate treatment claims.[1] The motion will be

---

1. "Findings in the disparate impact case based on [plaintiffs'] testimony will not pre-

**granted** as to the claims of Darren Glover, John Souchet and Lawrence Stewart and **denied** as to the claims of Adam Delgado and Gustavo Martinez.

## Background

The facts relating to the FBI's "discontinuation" of plaintiffs' Special Agent applications are set forth in the May 29, 2003, opinion and will be summarized here only as necessary.

Adam Delgado applied for a second time to the FBI in 1994 and passed all of the necessary tests. His application was discontinued after FBI headquarters received information from Chicago's FBI Field Office that two special agents and a staffing assistant who had encountered him during the application process found his behavior arrogant and condescending. The FBI asserts that the Chicago Field Office had additional information, including interviews with two of Delgado's graduate school professors who found him "unprofessional in meeting the obligations of his graduate program" and found that "his 'intense headstrong personality occasionally clouds his judgment,'" and the criticism of U.S. Air Force Major Renner that he had had to counsel Delgado about his need "to work at being a team player ... a number of times." Def.'s Reply, at 21 (citations to the record omitted).

Darren Glover's 1995 application was discontinued after the FBI found that he had not disclosed on his Long Form 140 application several incidents from which the FBI concluded that his history displayed a pattern of violence or intimidating behavior. A records check on Glover disclosed charges of disorderly conduct/fighting on March 28, 1987, criminal mischief on March 25, 1984, and assault on March 25, 1984, all of which were later dismissed, and a charge of trespass on March 24, 1984, as to which Glover was found guilty. Def.'s Mem., at 17–18 (citations to record omitted).

Gustavo Martinez applied to the FBI for a second time in 1998 and passed the initial two application phases. On June 26, 1998, he was given a conditional appointment letter that was later revoked for lack of candor. During his personal security interview, Martinez mentioned to Special Agent Cynthia Schlesinger that he had paid off several debts: $280 for a CPA review course, $200 for early discontinuation of his cellular telephone service, and a $40 bank fee assessment. The FBI's background check determined that these debts were not in fact paid off until after the personal security interview. The FBI additionally asserts financial irresponsibility as a basis for the discontinuation of Martinez's application. *See* Def.'s Reply, at 22 (citations to record omitted).

John Souchet completed the first phase of the application process in 1996 and filled out a Long Form 140 application. He was given a conditional appointment letter on January 8, 1997, and passed the personal security interview, the polygraph, the drug test and the medical examination. Souchet's conditional appointment letter was rescinded for lack of candor because he did not list on his Form 140 part time employment he had had six years earlier, when he was in college. Souchet had worked 12–13 hours per week at a Chicago law firm, helping to organize discovery documents. This employment came to the attention of the FBI when its background check turned up an earlier Office of Personnel Management ("OPM") background check conducted in 1993, when Souchet was a candidate

clude any issues of fact in any subsequent disparate treatment trial involving these parties." May 29, 2003 Op., at 3–4 n. 2.

for employment with the INS. The 1993 OPM report stated that Souchet resigned from the law firm job because he had been told he would be fired. The same report also stated that a subsequent check with the law firm revealed no adverse employment record as to Souchet. The FBI asserts that Souchet was "not discontinued for failing to disclose a part-time job he had for a few months[; r]ather, it was the pattern of non-disclosure that the OPM records showed when viewed together with the omissions on his FD–140." Def.'s Reply, at 22 (citations to record omitted). The FBI says that "[d]espite having been interviewed by an OPM investigator specifically about his stint with [the Chicago law firm], having obtained a copy of the OPM report and becom[ing] aware of its contents prior to his applying to the FBI, Mr. Souchet ... active[ly concealed this employment] when he told the FBI that he had been unemployed during the same time" he was employed at the law firm. Def.'s Mem., at 14 (citations to record omitted).

Lawrence Stewart applied to the FBI in September 1997 and was given a conditional letter of appointment in January 1998. The FBI discontinued his application for lack of candor when, during a polygraph examination, Stewart disclosed a shoplifting incident that had occurred when he was in the Army. Although the polygraph examination divulged no deception during Stewart's recounting of the facts of the incident, the background investigation revealed a military record of the incident that was at odds with Stewart's statement during the polygraph examination. Stewart also did not disclose the incident in his Long Form 140 application. According to the FBI, the official record of the incident showed that Stewart was charged with larceny of government property, found guilty, fined $75 and a special assessment of $25, and sentenced to 25 days in jail (suspended) and six months probation. Def.'s Mem., at 16.

## Analysis

When confronted with a motion for summary judgment, plaintiffs' claims must be examined under the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Plaintiffs must first establish a prima facie case of discriminatory failure to hire by showing (1) that they are members of a protected class; (2) that they applied for and were qualified for available positions; and (3) that, despite their qualifications, they were rejected. *See, e.g. Stewart v. Ashcroft,* 352 F.3d 422, 428 (D.C.Cir.2003) (citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817). In making this showing, plaintiffs must at least establish that their rejections were not based on the common and legitimate "reason on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications ...." *Id.* (citing *Morgan v. Fed. Home Loan Mortgage,* 328 F.3d 647, 651 (D.C.Cir.2003)).

If plaintiffs establish their prima facie cases, "the defendant then bears the burden of producing evidence that [they were] rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Id.* If this too is accomplished, the burden shifts back to plaintiffs "to provide sufficient evidence such that a jury could find th[e] 'proffered reason[s were] pretext for discrimination.'" *Id.* (quoting *Paquin v. Nat'l Mortgage Ass'n,* 119 F.3d 23, 27–28 (D.C.Cir.1997)).

The FBI asserts that the lack of candor of four of the plaintiffs and the lack of the fifth's ability to work with others establishes either that none of the plaintiffs was qualified to be a Special Agent (*i.e.* that none of them can establish a prima facie case of discrimination), or that it had legit-

imate nondiscriminatory reasons to discontinue all of their applications, or both.

*Adam Delgado*

■ Although the principal ground for the FBI's motion as to Adam Delgado is that he lacked the ability to get along with others, the FBI begins its discussion of Delgado by noting a "fatal flaw in his case"—that the decisionmaker who discontinued his application, Special Agent Maloy, "did not know that Mr. Delgado is Hispanic and, therefore, could not have revoked his conditional employment offer on that basis." Def.'s Mem., at 18 (citation to record omitted). That argument ignores the very irregular way in which Delgado's asserted "arrogance" was brought to Maloy's attention by agents from the Chicago office, which was enough without more to permit a finding of pretext. Note also that Delgado offers evidence that his supervisors in the Chicago Police Department and the military regarded him has having positive interpersonal skills, see, e.g., Pls.' Mem. Supp. Mot. Summ. J., Ex. 12. Moreover, "a disparate treatment plaintiff may employ statistics concerning the employment practices of the defendant to rebut explanatory defenses as pretextual." *Cook v. Boorstin,* 763 F.2d 1462, 1468 (D.C.Cir.1985). As recounted in the May 29, 2003 Opinion, plaintiffs have offered such evidence. Under *Aka v. Wash. Hosp. Ctr.,* " 'the factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.' " 156 F.3d 1284, 1290 (D.C.Cir.1998) (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). Delgado is entitled to a trial on his claim of disparate treatment.

*Darren Glover*

■ The FBI continues to argue as a threshold matter (for the third time) that Glover's claim of disparate treatment should be dismissed because Glover failed to exhaust his administrative remedies. I allowed Glover's claims to "go forward without prejudice to a further motion by defendant should it later develop that [his] claims are not essentially the same as those who did exhaust." September 25, 2001 Order (citing *Foster v. Gueory,* 655 F.2d 1319 (D.C.Cir.1981)). Now that the record is significantly more developed, it is quite apparent that Glover's disparate treatment claim is sufficiently similar to those of the plaintiffs who did exhaust that they will be allowed to proceed despite Glover's failure to file an EEOC complaint: the individual plaintiffs all assert disparate treatment on account of their race by the "subjective decision-making ... in the [f]inal [p]hase of the FBI Special Agent hiring process." Am. Compl., at ¶ 20; *see also Cook,* 763 F.2d at 1466. Because the FBI has denied that the process is subjective and results in discrimination against African–Americans and Hispanics at every step in this five year long action, there is no basis to believe that Glover's claim might have been settled administratively. *See Cook,* 763 F.2d at 1466. Under these circumstances, I find that Glover can be deemed to have vicariously satisfied the exhaustion requirements.

■] The FBI next asserts that summary judgment should be granted against Glover because it discontinued Glover's application for failure to include information and/or answering questions falsely on his Long Form 140. As the FBI has explained previously, that information—the fact that Glover had been charged with disorderly conduct/fighting, criminal mischief, and assault, and convicted of trespass—led to its conclusion that Glover's

history displayed a pattern of violence or intimidating behavior inappropriate for the Special Agent position. In response, Glover asserts that he "sincerely believed that he had not been arrested" and that he "was unaware that [the trespass] was an offense he had been charged with until after he received his file from the FBI," Pls.' Opp'n, at 18 (citations to record omitted). He also argues that other candidates who had significantly more violent arrest records were approved to be Special Agents and that he was not provided with an opportunity to "clear up questions that defendant might have had about his arrest history." *Id.*, at 18–19. Regardless of Glover's exact understanding of his criminal history, his explanations do not rebut the FBI's assertion that his negative answer to the question of whether he had ever been "arrested or charged with any violation including traffic, but excluding parking tickets" was false. Nor do they rebut the underlying and central premise of the FBI's decision to discontinue his application—Glover's criminal history demonstrated a history of violence and intimidating behavior. Accordingly, I find insufficient evidence to establish the defendant's proffered reasons as pretextual.

*Gustavo Martinez*

■ The FBI's proffered reason for discontinuing the application of Gustavo Martinez is that he "showed a lack of candor with respect to his financial status and demonstrated poor financial responsibility and poor judgment in the non-payment of debts." Def.'s Mem., at 15 (citation to record omitted). Martinez responds by pointing to evidence that he was actually forthcoming during his background investigation and that the special agent conducting his interview may have been confused by the timing of the repayment of his debts, *see* Pls.' Mem. Supp. Summ. J., Ex. 36 ("After review of the [summary of the

Personnel Security Interview, Special Agent Schlesinger] cannot state without a doubt that applicant said he had already cleared up the delinquent accounts, as opposed to saying that he was in the process of clearing up these accounts. It was never the opinion of the writer that applicant was attempting to hide any negative information regarding his financial status."); *see also id.*, Ex. 72 (testimony of Donna Furlan that "[d]uring the application process Mr. Martinez was forthright, honest, and did not attempt to conceal, hide or distort any information requested on the application."). He also offers evidence that the supervisor of former Special Agent Maloy (the decisionmaker) told Maloy that he did not agree with his decision to discontinue Martinez's application, *see id.*, Ex. 40, and that the only reason for the discontinuation of Martinez's application was his "lack of forthrightness regarding credit information that developed during his background investigation." Pls.' Tr. Ex. 84, at 1. I find that Martinez has presented enough evidence to create a genuine issue of material fact as to whether defendant's legitimate nondiscriminatory reason for discontinuing his application is mere pretext for discrimination.

*John Souchet*

In Souchet's case, unlike Glover's, the FBI's assertion of failure to exhaust administrative remedies is well taken. Souchet argues that his claims should be allowed to go forward under the rubric of *Foster v. Gueory*, 655 F.2d 1319 (D.C.Cir. 1981). In that case, the D.C. Circuit allowed intervention by individuals who had not filed EEOC claims in an action brought by plaintiffs who had exhausted because of the similarity of the two sets of complaints. *Foster*, 655 F.2d at 1323. The Court reasoned that "[w]here the two claims are so similar that it can fairly be

said that no conciliatory purpose would be served by filing separate EEOC charges, then it would be 'wasteful, if not vain' to require separate EEOC filings." *Id.* (citation omitted).

 Unlike the intervenors in *Foster,* Souchet did file an EEOC complaint. In fact, he went through the entire administrative process and received, as part of the EEOC's March 7, 2000 affirmance of the agency's decision against him, a 90–day right to sue warning. *See* Def.'s Opp'n to Pls.' Mot. for Leave to File Am. Compl., Ex. G. It is undisputed that Souchet did not sue within 90 days and that he took no action in federal court until he joined this action on December 12, 2000, after Delgado was given leave to file an amended complaint. Absent equitable tolling, estoppel and waiver, this failure to timely file requires dismissal. *See Brown v. Marsh,* 777 F.2d 8, 14 (D.C.Cir.1985) (quoting *Shehadeh v. Chesapeake & Potomac Tel. Co.,* 595 F.2d 711, 717–18 (D.C.Cir.1978)). In prior briefing to the Court, *see* Pls.' Opp'n to Def.'s Mot. to Dismiss in Part Pls.' Am. Compl., at 10, plaintiffs argued that Souchet's claims are entitled to tolling. In *Crown, Cork & Seal Co., Inc. v. Parker,* 462 U.S. 345, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983), the Supreme Court held that the filing of a class action tolled the statute of limitations for members of the class, including the plaintiff in that action, who had received a right to sue letter after the class action was filed. Applying *Crown* to this case, if the original complaint in this action had been a class complaint, Souchet's time to file his civil action would have been tolled. The original complaint in this action was not a class complaint, however. As filed by Delgado it raised only individual claims. *See* Compl. (filed on Aug. 30, 1999). Souchet's disparate treatment claim must be dismissed as untimely.

*Lawrence Stewart*

 The FBI asserts that it discontinued Lawrence Stewart's application for lack of candor because, during a polygraph examination, he recounted the facts of a shoplifting incident that had occurred when he was in the Army in a way that was odds with the Army's report of the incident. Stewart had also answered "no" on his Long Form 140 application to the question whether he had ever been arrested or charged with any violation, when the shoplifting incident in fact resulted in a charge and a conviction.

In response, Stewart offers only evidence that "because of sketchy information, an order was issued ... to re-interview him concerning the incident," and that he "was not aware that a jail sentence had been suspended or that a $75 fine had been imposed." Pls.' Opp'n, at 19 (citations to record omitted). Even accepting this statement as true, there is nothing in this evidence that could convince a reasonable jury that the FBI's reason for discontinuing his application is mere pretext for discrimination. Stewart's disparate treatment claims will be dismissed.